******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

D'AURIA, J., dissenting. In this certified appeal, the court today holds that, in terrorem clauses, also known as no-contest causes, violate the state's public policy, unless a beneficiary's challenge to a trustee's or executor's actions is in bad faith or frivolous. Specifically, the majority holds that "an in terrorem clause violates public policy when its application would interfere with the Probate Court's exercise of its statutorily mandated supervisory responsibilities over the administration of an estate and its superintendence of the fiduciary's statutory obligations." In my view, absent any pertinent legislative action, for a supposed interest to qualify as a "state public policy" sufficient to overcome an interest such as the one implicated here—a testator's right to impose such conditions as she pleases upon the vesting or enjoyment of her estate, which this court has consistently upheld—the public interest must be strong, important, clearly articulated, and dominant. This is especially so because our statutes provide mechanisms for the Probate Court to comply with its duty to oversee fiduciaries. Accordingly, I respectfully dissent.

Initially, I observe that, when asked to exercise our judicial authority to declare the public policy of the state, and to declare further that this public policy trumps otherwise legal actions or relationships, we have, in other contexts, considered closely—and appropriately so—the strength of the public interest we are being asked to vindicate measured against other public or private interests at stake. See, e.g., *Priore* v. *Haig*, 344 Conn. 636, 658, 280 A.3d 402 (2022) (weighing public interest in public participation in public hearing on special permit application before town's planning and zoning commission against private interest of protecting individuals from false statements in determining if public policy justified application of immunity to statements made during hearing). We also carefully examine the sources from which we draw our conclusions about the supposed public policy of the state. See id.

For example, notwithstanding that contracts of employment for an indefinite term, at common law, were, and remain, terminable "at will," without the need for "a showing of just cause for dismissal"; *Sheets* v. *Teddy's Frosted Foods, Inc.*, 179 Conn. 471, 474, 427 A.2d 385 (1980); we have "sanctioned a common-law cause of action for wrongful discharge in situations in which the reason for the discharge involved impropriety 'derived from some important violation of public policy.' " *Daley* v. *Aetna Life & Casualty Co.*, 249 Conn. 766, 798, 734 A.2d 112 (1999), quoting *Sheets* v. *Teddy's Frosted Foods, Inc.*, supra, 475. "[W]e repeatedly have underscored our adherence to the principle that the public policy exception to the general rule allowing unfettered

termination of an at-will employment relationship is a narrow one . . . . Consequently, we have rejected claims of wrongful discharge that have not been predicated [on] an employer's violation of *an important and clearly articulated public policy*." (Emphasis added; internal quotation marks omitted.) *Dunn* v. *Northeast Helicopters Flight Services, LLC*, 346 Conn. 360, 371, 290 A.3d 780 (2023). As we recognized in *Morris* v. *Hartford Courant Co.*, 200 Conn. 676, 513 A.2d 66 (1986), however, because of "the inherent vagueness of the concept of public policy, it is often difficult to define precisely the contours of the exception." Id., 680. Said another way, it is not clear in every case precisely what public interest is at stake and, once identified, whether that public interest is sufficiently important or clearly articulated to justify applying the public policy exception to the at-will employment doctrine.

A complication that can arise, when considering whether to invalidate a contractual provision in the name of public policy, is that there may be competing public and private interests. For example, this court has recognized as "well established that parties are free to contract for whatever terms on which they may agree . . . [although] it is equally well established that contracts that violate public policy are unenforceable." (Internal quotation marks omitted.) *Geysen* v. *Securitas Security Services USA, Inc.*, 322 Conn. 385, 392, 142 A.3d 227 (2016). In light of these dueling principles of law, a contract provision violates public policy, and is unenforceable, if it "negate[s] laws enacted for the common good or is designed to evade statutory requirements . . . ." (Internal quotation marks omitted.) Id., 397.

A "specific application" of this "general [common-law] doctrine . . . that a court may refuse to enforce contracts that violate law or public policy" is found in our cases in which a party to a voluntary arbitration agreement asks a court to vacate the arbitration award on the ground that enforcing it would violate public policy. (Internal quotation marks omitted.) *HH East Parcel, LLC* v. *Handy & Harman, Inc.*, 287 Conn. 189, 197, 947 A.2d 916 (2008). "The public policy exception applies only when the award is *clearly* illegal or *clearly* violative of a *strong* public policy." (Emphasis added; internal quotation marks omitted.) *State* v. *New England Health Care Employees Union, District 1199, AFL-CIO*, 271 Conn. 127, 135, 855 A.2d 964 (2004). We have said further in this context that "the public policy exception to arbitral authority should be narrowly construed and [a] court's refusal to enforce an arbitrator's . . . [award] is limited to situations [in which] the contract as interpreted would violate some *explicit* public policy that is well defined and *dominant*, and is to be ascertained by reference to the laws and legal precedents *and not from general considerations of supposed public interests*." (Emphasis added; internal quotation

marks omitted.) Id., 135–36. "[G]eneral notions of the public good, public accountability or the public trust are insufficient grounds for invoking the extremely narrow public policy exception to judicial enforcement of arbitral awards." *New Haven* v. *AFSCME, Council 4, Local 3144*, 338 Conn. 154, 187–88, 257 A.3d 947 (2021).

I would scrutinize with the same rigor as in these other contexts the claimed public policy the defendant, Joan Cardello, advances to invalidate the in terrorem clauses at issue in the present case. In other words, I believe that, for a public interest to constitute a public policy of such importance as to negate the clear and explicit intent of a testator, as stated in an in terrorem clause, the public interest must be strong, important, clearly articulated, and dominant. This approach is justifiable and logical, in my view, because, in weighing the importance of a probate court's supervision of fiduciaries and in ultimately vindicating this supposed public interest, this court should also be mindful of any competing interests—private or public—that our law has historically protected. If we fail to consider the strength of the competing public and private interests at stake, this court in essence becomes the "roving commission" we so often say we are not, arrogating to ourselves the "general legal oversight . . . of private entities" in the name of vindicating public policy. *TransUnion LLC* v. *Ramirez*, U.S. , 141 S. Ct. 2190, 2203, 210 L. Ed. 2d 568 (2021); see also *CT Freedom Alliance, LLC* v. *Dept. of Education*, 346 Conn. 1, 28, 287 A.3d 557 (2023).

In particular, for more than one century, this court has recognized the "general rule [that] a testator has the right to impose such conditions as he pleases upon a beneficiary as conditions precedent to the vesting of an estate . . . ." (Internal quotation marks omitted.) *DeLadson* v. *Crawford*, 93 Conn. 402, 410, 106 A. 326 (1919); accord *Greenwich Trust Co.* v. *Tyson*, 129 Conn. 211, 218, 27 A.2d 166 (1942); see also *Peiter* v. *Degenring*, 136 Conn. 331, 335, 71 A.2d 87 (1949) ("[a] testator may impose such conditions as he pleases upon the vesting or enjoyment of the estate he leaves, provided they are certain, lawful and not opposed to public policy"). Our courts have "sustain[ed] forfeiture clauses as a method of preventing will contests, which so often breed family antagonisms, and expose family secrets better left untold, and result in a waste of estates through expensive and long drawn-out litigation." *South Norwalk Trust Co.* v. *St. John*, 92 Conn. 168, 175, 101 A. 961 (1917); see also *McGrath* v. *Gallant*, 143 Conn. App. 129, 132, 69 A.3d 968 (2013) (testator inserted in terrorem clause into will given "history of strife among his children . . . anticipat[ing] that the animosity among the siblings would only escalate after his death"); cf. *Parker* v. *Benoist*, 160 So. 3d 198, 205 (Miss. 2015) ("forfeiture clauses may serve a valuable purpose in deterring 'unwarranted challenges to the donor's intent by a disappointed person seeking to gain unjusti-

fied enrichment,' or preventing 'costly litigation that would deplete the estate or besmirch the reputation of the donor,' or discouraging 'a contest directed toward coercing a settlement—the so-called strike suit' "); *Russell* v. *Wachovia Bank, N.A.*, 370 S.C. 5, 12, 633 S.E.2d 722 (2006) ("[No-contest] clauses may protect estates from costly and time-consuming litigation and minimize the bickering over the competence and capacity of testators, and the various amounts bequeathed. . . . No-contest clauses may have the desirable effect of ensuring that the details of a testator's private life are not made public." (Citation omitted; internal quotation marks omitted.). There has been no suggestion in the present case that these principles and interests do not apply equally to trusts.

More recently, we have reiterated that "[t]he cardinal rule of testamentary construction is the ascertainment and effectuation of the intent of the testator, if that [is] possible. If this intent, when discovered, has been adequately expressed and is not contrary to some positive rule of law, it will be carried out." (Internal quotation marks omitted.) *Schwerin* v. *Ratcliffe*, 335 Conn. 300, 310, 238 A.3d 1 (2020); see also *Corcoran* v. *Dept. of Social Services*, 271 Conn. 679, 700, 859 A.2d 533 (2004) ("[i]t is well settled that in the construction of a testamentary trust, the expressed intent of the testator must control" (internal quotation marks omitted)). Thus, it is clear that Connecticut law has historically protected a testator's right to control his property while he or she is living, and by will to direct its use after his or her death, unless to effectuate that intent would violate a positive rule of law. See *Peiter* v. *Degenring*, supra, 136 Conn. 335.[1] One such "positive rule of law" in Connecticut is statutory: namely, that, regardless of any provisions in the will, a surviving spouse may, subject to certain exceptions, elect "to take a statutory share of the real and personal property passing under the will of the deceased spouse" rather than take what the deceased spouse has by will devised or bequeathed to the surviving spouse. General Statutes § 45a-436 (a).[2]

To secure a judicial determination that this competing interest in favor of upholding a testator's stated intent has been overcome—that is, it violates a positive rule of law—I would require a showing of a strong, important, clearly articulated, and dominant public interest that outweighs the private interests in allowing testators to devise their property as they see fit. In the present case, the defendant contends, and the majority agrees, that, when a beneficiary brings a good faith challenge to the actions of a fiduciary, enforcement of the in terrorem clauses at issue contravenes the administrative interests embodied in General Statutes §§ 45a-175, 45a-233 (d) and 45a-242 (a). See footnotes 6–8 of the majority opinion. Specifically, the majority holds that these statutes reflect policies important enough and strong enough to justify the judicial action the court

takes today, invalidating in terrorem clauses employed for decades because beneficiaries assist the Probate Court in monitoring the actions of fiduciaries. I lack the majority's confidence that I can divine that this is in fact a sufficiently dominant public policy of our state. Instead, just as the majority would defer to the legislature consideration of whether the application of a good faith, probable cause exception constitutes an independent basis for relieving the defendant from the application of the in terrorem clauses, I am reluctant to declare that these clauses violate public policy.

The majority's survey of the few other jurisdictions that have addressed the issue reveals that some courts have in fact held that these clauses are unenforceable because insulating the fiduciary from challenge violates the policy underlying state statutes requiring court supervision of these fiduciaries. The majority's discussion of these cases is accurate, and I will not repeat it here.

There are cases that take a different approach than the court does in the present case, however. For example, Wyoming courts have held that in terrorem clauses are enforceable, recognizing both a long judicial history of upholding of a testator's clearly expressed intent and the fact that Wyoming's legislature has not adopted the rule the majority in the present case adopts judicially, despite having had a chance to do so. Specifically, in *EGW* v. *First Federal Savings Bank of Sheridan*, 413 P.3d 106 (Wyo. 2018), the plaintiffs claimed that an in terrorem provision was void because, by allowing a minor child's parents to deprive him of property, the provision violated the public policy underlying constitutional provisions protecting minors, providing for due process, and providing access to the courts. Id., 111–12. In rejecting the plaintiffs' claim, the court emphasized its well established precedent upholding "the absolute right of the testator to dispose of his property after death as he sees fit, provided he is legally qualified so to do and acts as the law directs." (Internal quotation marks omitted.) Id., 110. The court explained that "[n]o right of the citizen is more valued than the power to dispose of his property by will. No right is more solemnly assured to him by the law. Nor does it depend in any sense upon the judicious exercise of that right. It rarely happens that a man bequeaths his estate to the entire satisfaction of either his family or friends. The law wisely secures equality of distribution where a man dies intestate, but the very object of a will is to produce inequality. . . . In this country a man's prejudices form a part of his liberty. He has a right to them. He may be unjust to his children or relatives. He is entitled to the control of his property while living, and by will to direct its use after his death, subject only to such restrictions as are imposed by law." (Internal quotation marks omitted.) Id.

The court in *EGW* noted that, because of that policy, the court in *Dainton* v. *Watson*, 658 P.2d 79, 81 (Wyo. 1983), "previously [had] rejected the claim that no-contest clauses are unenforceable as violative of public policy, even [when] a challenge to the testamentary instrument is made in good faith and with probable cause." *EGW* v. *First Federal Savings Bank of Sheridan*, supra, 413 P.3d 110. Specifically, in *Dainton*, the trial court declared a bequest to the defendant forfeited pursuant to the terms of an in terrorem clause in the will. *Dainton* v. *Watson*, supra, 79. The defendant appealed, claiming that the in terrorem clause was invalid because "public policy demands that those who contest wills in good faith and with probable cause to believe that a will is invalid should be protected from strict enforcement of the terms of a no-contest clause"; id., 82; based on § 3-905 of the Uniform Probate Code, which provides: "A provision in a will purporting to penalize any interested person for contesting the will or instituting other proceedings relating to the estate is unenforceable if probable cause exists for instituting proceedings." (Internal quotation marks omitted.) Id., 80. The court in *Dainton* rejected the defendant's argument, holding that (1) the claim "ignore[d] the overriding policy of [the] court and the [well accepted] principle elsewhere that a testator's intent as determined by the language in his will is controlling"; id., 82; and, (2) unlike the legislatures of other states, Wyoming's legislature had chosen not to incorporate § 3-905 of the Uniform Probate Code into Wyoming's then recent enactment of its probate code. Id.; see also *In re Houston's Estate*, 371 Pa. 396, 399, 89 A.2d 525 (1952) ("[I]f a testator may disinherit his children, he may also condition their legacies so that the happening of a certain event will result in their disinheritance. Here . . . the widow was faced with the unfortunate choice of receiving a small legacy or causing the children to lose their bequests, but that, once again, is a question of the wisdom of the testator and not public policy."); T. Challis & H. Zaritsky, State Laws: No-Contest Clauses, p. 2 ("The largest group of states (22) adopt the Uniform Probate Code rule and state that no-contest clauses are enforceable, unless the contest is based on probable cause. Sixteen of these states have adopted [§] 2-517 and/or [§] 3-905 of the Uniform Probate Code, to this effect. See Alaska, Arizona, Colorado, Hawaii, Idaho, Maine, Massachusetts, Michigan, Minnesota, Montana, Nebraska, New Jersey, New Mexico, North Dakota, South Carolina, South Dakota, and Utah. Five more states, Iowa, Kansas, Maryland, Pennsylvania and Wisconsin, have a similar rule, but without using the specific language of the [Uniform Probate Code].") available at http://www.actec.org/assets/1/6/State_Laws_No_Contest_Clauses_-_Chart.pdf) (last visited September 21, 2023).[3]

The two concerns raised by the court in *Dainton* apply equally in the present case. In my view, our state's

probate administration statutes, which have existed for decades, in tandem and in harmony with in terrorem clauses, manifest at best a generalized notion of the public good; see *New Haven* v. *AFSCME, Council 4, Local 3144*, supra, 338 Conn. 187–88; and not the strong, important, clearly articulated, and dominant public policy that we should require before acting judicially to overcome the testator's explicit intent. The court's holding today means that the enforcement of in terrorem clauses has been violating public policy since the advent of our current Probate Court system and that the innumerable in terrorem clauses inserted by individuals into wills and trusts for decades—perhaps centuries—are suddenly illegal notwithstanding that this court has "sustain[ed]" them for more than one century "as a method of preventing will contests . . . ." *South Norwalk Trust Co.* v. *St. John*, supra, 92 Conn. 175.

Moreover, despite various amendments to the statutes governing probate procedures, wills, and trusts in the last decade; see, e.g., Public Acts 2019, No. 19-137 (adopting Connecticut Uniform Trust Code, General Statutes § 45a-499a et seq.); Connecticut's legislature, unlike other state legislatures; see R. Weisbord, "The Governmental Stake in Private Wealth Transfer," 98 B.U. L. Rev. 1229, 1273 n.240 (2018), citing T. Challis & H. Zaritsky, supra, p. 2; never has amended the statutes governing the Probate Court to render in terrorem clauses unenforceable in their entirety or under particular circumstances, even though it has had the opportunity to do so. Specifically, the legislature has not adopted the Uniform Probate Code as a whole or § 3-905 to create an exception for good faith and probable cause. This is telling because the legislature has explicitly adopted particular sections of the Uniform Probate Code, showing that it knows how to do so when it wants to, but has not done so in relation to in terrorem clauses. See *In re Joshua S.*, 260 Conn. 182, 206 n.18, 796 A.2d 1141 (2002) (discussing legislative history of amendment to General Statutes § 45a–596, which explained that amendment "follow[ed] the lead of [Uniform Probate Code § 5-202]" (internal quotation marks omitted); G. Borrelli, "The Appointment of a Neutral Third-Party Conservator in Connecticut: Where Do We Stand?," 26 Quinnipiac Prob. L.J. 156, 175 (2012) ("Connecticut has adopted the [Uniform Probate Code's last resort] option to appointing a conservator as well as the clear and convincing evidence standard"). Nor has this court, until today, relied on as persuasive authority § 96 (2) of the Restatement (Third) of Trusts,[4] which provides that "[a] no-contest clause shall not be enforced to the extent that doing so would interfere with the enforcement or proper administration of the trust." See, e.g., *Ferguson* v. *Ferguson*, 167 Idaho 495, 506, 473 P.3d 363 (2020) (relying on § 96 (2) of Restatement (Third) of Trusts to hold that in terrorem clause was unenforceable).

The majority itself acknowledges that it is for the legislature to determine whether a good faith and probable cause exception applies to in terrorem clauses, allowing beneficiaries to object to a fiduciary's actions if they do so in good faith and with probable cause. Although the majority states that it is not deciding the applicability of the good faith, probable cause exception by holding that in terrorem clauses are viable only when a beneficiary's challenge to the fiduciary's actions is not brought in good faith, the majority, in essence, takes this decision out of the legislature's hands.

The majority takes this action by invoking the public interest in the Probate Court's supervision of fiduciaries but fails to explain how the enforcement of in terrorem provisions has hampered this interest in the decades that these kinds of clauses have been quietly coexisting with our statutes governing probate proceedings. The answer may lie in the fact that other statutes provide means for the Probate Court to supervise fiduciaries and have for decades. Although it is true that beneficiaries may assist the Probate Court in monitoring the actions of fiduciaries; see General Statutes § 45a-175 (c) (1) ("[a]ny beneficiary of an inter vivos trust may petition a Probate Court specified in section 45a-499p for an accounting by the trustee or trustees"); the Probate Court's duty and power to supervise fiduciaries are not limited to issues that beneficiaries raise. Rather, it is undisputed in the present case that, eventually, there would have been a final accounting at which time the Probate Court would have been required to review the filings at issue and could have addressed any errors. See General Statutes § 45a-175 (a) (Probate Court "shall have jurisdiction of the interim and final accounts of testamentary trustees"); General Statutes § 45a-177 (a) ("[a]ll conservators, guardians and trustees of testamentary trusts, unless excused by the will creating the trust, shall render periodic accounts of their trusts signed under penalty of false statement to the Probate Court having jurisdiction for allowance, at least once during each three-year period and more frequently if required by the court or by the will or trust instrument creating the trust"); General Statutes § 45a-286 ("[a]ny court of probate shall, before proving or disapproving any last will and testament, or codicil thereto, hold a hearing thereon, of which notice, either public or personal or both, as the court may deem best, has been given to all parties known to be interested in the estate, unless all parties so interested sign and file in court a written waiver of such notice, or unless the court, for cause shown, dispenses with such notice"). Additionally, although our statutes allow beneficiaries to raise challenges to the actions of a trustee or executor, they also allow probate courts to challenge and penalize trustee or executor misconduct on their own motion. See General Statutes § 45a-242 (a) ("[t]he Probate Court having jurisdiction may, upon its own motion . . .

after notice and hearing, remove any fiduciary"); General Statutes § 45a-98 (a) (6) (Probate Court, "to the extent provided for in section 45a-175, [may] call executors, administrators, trustees . . . to account concerning the estates entrusted to their charge"). Thus, contrary to the majority's contention, in terrorem clauses do not allow testators to "shut the door of truth and prevent the observance of the law . . . ." (Internal quotation marks omitted.)

The in terrorem clauses at issue in the present case in particular provide another means for the Probate Court to supervise fiduciaries. These clauses explicitly contemplate actions by the beneficiary that would not implicate these clauses. Specifically, both clauses prohibit a beneficiary from objecting to the fiduciary's actions but only so long as the fiduciary has taken those actions in good faith.[5] Thus, if the fiduciary in the present case did not take a defensible position on the inclusion of the allegedly improper information in the tax documents, the in terrorem clauses would not protect the fiduciary against action by the beneficiary.

But the clauses also contemplate that the executor or trustee might make mistakes or that there might be good faith disagreements over actions the executor or trustee might undertake. Nonetheless, it is clear from the language of the clauses that the testator intended for the determinations of the executor or trustee, absent bad faith, to be the end of the matter. This result would not be so unusual. Under our various standards of review, our courts are required under certain circumstances to tolerate the mistakes of other denominated decision makers, even when the court itself would have made different findings or reached different conclusions. See, e.g., *McCann* v. *Dept. of Environmental Protection*, 288 Conn. 203, 217, 952 A.2d 43 (2008) ("[F]actual errors do not constitute grounds for vacating the arbitrator's decision. . . . [T]he arbitrators are empowered to decide factual and legal questions and an award cannot be vacated on the [ground] that . . . the interpretation of the agreement by the arbitrators was erroneous." (Citation omitted; internal quotation marks omitted.)).

In my view, enforcing the in terrorem clauses in this case implicates no issues of public importance. Rather, the facts of the present case illustrate how broadly applying a generalized—and in this case, at best, administrative—interest in the name of "public policy" constitutes an unwarranted intrusion on private interests. This is not a case involving a beneficiary who acted as a whistle-blower, shedding light on scandalous or improper behavior by a fiduciary. Rather, the defendant, as the single beneficiary of nearly the entire estate of the decedent, challenged the executor's filing of an allegedly inaccurate tax return. Describing the supposed public policy at stake as "the state's interest in

receiving accurate tax filings and payments"; *Salce* v. *Cardello*, 210 Conn. App. 66, 80, 269 A.3d 889 (2022); or the fiduciary's actions as "endanger[ing] the interests of the beneficiaries or the estate," dresses up what is essentially a dispute about how much the defendant would receive from the estate. Id., 81. Perhaps the fiduciary's actions resulted in the estate's overpayment of taxes and therefore, perhaps, in turn, reduced the defendant's inheritance. As far as I can see, no state interest justifies voiding previously valid in terrorem clauses on the ground of public policy. The testator expressly stated her intent that beneficiaries should not contest the actions of the executor or trustee and thereby waste time and money on such a dispute.

That this is fundamentally a private matter not implicating a strong, important, clearly articulated, and dominant public policy is made even more clear by the fact that the testator originally appointed the defendant the executor of her estate. As the executor, the defendant would have been the one to file the tax documents at issue and, presumably, would have insisted on including what, in her view, was the accurate information. Instead of being personally involved in filing the tax documents, however, the defendant declined to take on the executor role her mother had asked her to, instead deciding to second-guess determinations the executor made in his role that might be against her interest. By the terms of the trust and will, that is exactly what her mother did not want. I fail to see a public interest strong enough, clear enough, and important enough to overcome the testator's own interest in placing a condition on the distribution of the trust's proceeds to any and all beneficiaries, either to prevent family strife or to prevent dissipation of the estate.

Accordingly, I respectfully dissent.

[1] It has been said that the law "abhors a forfeiture" and that, as the Appellate Court recognized, in terrorem clauses "are disfavored by the courts and thus must be construed strictly to prevent forfeiture." *Salce* v. *Cardello*, 210 Conn. App. 66, 74, 269 A.3d 889 (2022). These are, at best, maxims as opposed to positive rules of law. See *Micek-Holt* v. *Papageorge*, Superior Court, judicial district of Windham at Putnam, Docket Nos. CV-14-6008881-S and CV-15-5006173-S (September 26, 2016) ("court is mindful of the [maxim] 'equity abhors a forfeiture' "), aff'd, 180 Conn. App. 540, 183 A.3d 1213, cert. denied, 328 Conn. 934, 183 A.3d 634 (2018). Like the Appellate Court, the majority does not attempt to arrive at a narrow construction of the clauses at issue to prevent a forfeiture, nor could it given their broad language. Rather, both the Appellate Court and the majority have invalidated the clauses entirely, an altogether different undertaking for which there is no equivalent maxim.

[2] A "statutory share" means "a life estate of one-third in value of all the property passing under the will, real and personal, legally or equitably owned by the deceased spouse at the time of his or her death, after the payment of all debts and charges against the estate." General Statutes § 45a-436 (a).

[3] Additionally, some state courts have upheld in terrorem clauses as a matter of public policy because they recognize a distinction between challenges to the provisions of the will or trust and challenges to the trustee's or executor's action. See *McLendon* v. *McLendon*, 862 S.W.2d 662, 679 (Tex. App. 1993, writ denied) ("We construe the language of the in terrorem clause to prohibit a beneficiary from contesting the validity of the will or seeking to attach, modify, or impair the validity of the provisions. It does not prohibit a beneficiary from instituting legal action against a [coexecutor] for breach

of fiduciary duties. We disagree with [the coexecutor's] contention that the clause applies to any challenge of the [coexecutor's] right to engage in business in partnership form. The right to challenge a fiduciary's actions is inherent in the fiduciary/beneficiary relationship."); *In re Estate of Rimland*, 2003 WL 21302910, *2 (N.Y. Sur. June 3, 2003) ("In terrorem clauses are designed to prevent attacks on the validity of a will and it has been held that they do not come into play where the issue is whether a fiduciary nominated in the will is qualified to serve in that capacity (*In re Estate of Stralem*, 181 Misc. 2d 715, 695 N.Y.S.2d 274 [1999]) or where the issue is whether a legacy to a charity under the will is barred under the law (*In re Estate of Alexander*, 90 Misc. 2d 482, 395 N.Y.S.2d 598 [1977]).").

[4] Comment (e) to § 96 (2) of the Restatement (Third) of Trusts provides in relevant part: "The rule of Subsection (2) provides only that an otherwise enforceable no-contest clause is unenforceable insofar as doing so would inhibit beneficiaries' enforcement of their rights under a trust (whether created by the will or other instrument) or would otherwise undermine the effective, proper administration of the trust. Suits to enforce the duties of trustees, or to determine the proper meaning or effect of the terms of a trust or to enforce those terms, normally have the effect of seeking to ascertain and implement settlor intentions and trust provisions under the instrument—rather than constituting a 'contest' or challenge to the instrument or its provisions.

"Accordingly, a no-contest clause ordinarily (see Reporter's Note, final paragraph) is unenforceable to prevent or punish: a beneficiary's petition for instructions (§ 71, even though, for example, it seeks an interpretation contrary to the trustee's interpretation—and see further Reporter's Note to this Comment); a demand for or challenge to a trustee's accounting (§ 83); a suit to enjoin or redress a breach of trust (§ 95); a petition for removal of a trustee for unfitness or for repeated or serious breach of trust (§ 37); a suit alleging that a trustee's particular exercise of discretion or even 'absolute' discretion constituted an abuse of discretion (§ 87); or the like. Similarly, a beneficiary's allegation that a trustee's misconduct exceeded the standard of misconduct permissibly protected by an exculpatory clause (Comments b and c) is not a contest of that provision of the instrument. See generally § 27 (2) and § 27, Comment b, and Reporter's Note thereto. See also Restatement Third, Property (Wills and Other Donative Transfers) § 8.5, Comment d, on suits to construe, reform, or modify.

"The rule of this Subsection (2) does not prevent enforcement of a no-contest clause insofar as it would, absent probable cause, exact forfeiture: (a) for a beneficiary's challenge to the validity of a trust or trust provision on grounds of incapacity (§ 11), lack of due execution (§§ 17–23), or forgery, fraud, undue influence, or other wrongful procurement (§ 12); or (b) for a beneficiary's claim either (i) as a creditor or (ii) as the owner of property that the settlor intended to include in the trust, provided, in either case, that the no-contest clause is clearly intended to apply to such a claim." 4 Restatement (Third), Trusts, § 96 (2), comment (e), pp. 31–32 (2012).

[5] The in terrorem clause in the trust agreement provides in relevant part: "If [a] beneficiary under this [t]rust [a]greement . . . directly or indirectly . . . (iv) objects in any manner to any action taken or proposed to be *taken in good faith by any* [t]*rustee* . . . [and/or] (vii) files any creditor's claim against [the] [t]rustee (without regard to its validity) . . . then that person's right as a beneficiary of this [t]rust [a]greement and to take any interest given to him or her by terms of this [t]rust [a]greement . . . shall be determined as it would have been determined if the person and the person's descendants had predeceased [the] [s]ettlor without surviving issues . . . ." (Emphasis added.)

The in terrorem clause in the will likewise provides in relevant part: "If [a] beneficiary hereunder . . . directly or indirectly . . . (iv) objects in any manner to any action taken or proposed to be *taken in good faith by any* [e]*xecutor or trustee* . . . [and/or] (vii) files any creditor's claim against my [e]xecutor (without regard to its validity) or trustee . . . then that person's right as a beneficiary of this [w]ill and any [c]odicil thereto or trust . . . shall be determined as it would have been determined if the person and the person's descendants had predeceased me without surviving issue. . . ." (Emphasis added.)